**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND**

**CIVIL ACTION NO: 05-513ML.**

**PAUL J. JENKINS**

**VS.**

**MARGARET DAVIS MULLEN**
**WILLIAM F. MULLEN**
**JOHN DOE**
**STEVEN DINEZZA**
**LEA DINEZZA**
**PAUL GILMORE**
**AFFORDABLE FUNDING MORTGAGE CORPORATION**
**RICHARD COSTA**
**ARGENT MORTGAGE COMPANY, LLC**

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DINEZZA'S MOTION TO DISMISS UNDER RULES 9(B) AND 12(b) (6)**

## I. INTRODUCTION AND SUMMARY OF ARGUMENT

Plaintiff's complaint asserts claims under the Racketeer and Corrupt Organizations Act ("RICO), U.S.C. SS 1961 et seq, as well as allegations of common law fraud and Deceit. This complaint clearly describes the roles of all defendants in the alleged scheme, The nature of the acts, as well as an accurate timeline. The particulars of the allegations satisfy all notice pleading requirements, affording all defendants an ample opportunity to frame an adequate response.

Dinezza's supporting memorandum for the most part attempts to "piggy-back" off the lame arguments already advanced by Argent. Dinezza also demonstrates a similar

penchant for twisting the holdings of cited cases and failing to distinguish marked distinctions in facts patterns.

## II. STATEMENT OF FACTS

In March of 2003 Jenkins agreed to purchase residential property in Providence, Rhode Island from Dinezza. The seller, Dinezza, employed Doe as a real estate broker. Part of the alleged scheme involved using the artifice of an inflated purchase price that would result in Jenkins paying the broker's commission via a second mortgage, all unbeknownst to Jenkins. Another part of the scheme involved baiting potential poor-credit buyers, such as Jenkins, via classified ads promising that they could buy the property by "assuming the mortgage regardless of credit" with a small down payment. Jenkins had seen this classified ad for the subject property in December of 2002 and also in February of 2004. Doe informed Jenkins that a previous deal to purchase the property in late 2002 or early 2003 had "blown up." Doe took Jenkins' application to buy the property, and apparently noticing that Jenkins had access to ample funds at the time, informed Jenkins that he could find Jenkins a first mortgage from his "network of lenders."

On March 3, 2003 Dinezza and Jenkins signed a purchase and sale agreement whereby Jenkins would purchase real estate located at 107 Hendrick Street, Providence, RI from Dinezza. This agreement specified a purchase price of $148,900.00 for the subject property, and was reached after an exchange of faxes and mailings between Dinezza, Jenkins, and Dinezza's real estate broker, "John Doe." This was the only contract known to Jenkins at the time.

Doe requested that Jenkins send a certified check or money order for the appraisal fee directly to the appraiser, defendant Gilmore. Doe said that he would meet Gilmore at the property to take care of things. Toward the middle of March 2003 Doe informed Jenkins that the property had "made" appraisal, and that the deal would go forward. Previously, during early March 2003, Doe directed Costa, an employee of Affordable , to contact Jenkins about a mortgage application. Costa did in fact contact Jenkins by phone to discuss the deal, which still contemplated a purchase price of $148,900.00.

During the mortgage approval process, not only did the terms of various mortgage proposals Change, the purchase price of the property fluctuated. Doe and Costa informed Jenkins that due to "credit issues" the lender would not advance sufficient funds to close, at which point Doe offered to absorb the alleged shortfall via a second mortgage covering his brokerage commission of $8,900.00. Jenkins received various loan documentation from Argent and Affordable indicating purchase prices of $148,900.00, $145,000.00 and finally $140,000.00. Costa informed Jenkins that these documents were generated in "error," and to fax him copies of these documents, which Jenkins did. At the same time Doe insisted that he (Doe) understood the "numbers" better than Costa. One can logically intuit that Dinezza, Doe, Costa and Affordable cooperated to supply Argent (via mail, fax or modem) with one or more altered copies of the purchase and sales agreement

In point of fact, the alleged shortfall resulted from a property appraisal reflecting a home value of $140,000.00, but with an assumption that the seller was making a $7,000.00 cash contribution to buyer's closing costs; the actual purchase and sale agreement signed by Jenkins contained a purchase price of $148,900.00 with no assumption of a cash contribution by the seller. The real estate appraiser, Gilmore, clearly had knowledge of the scheme, and used the

clever device of a low appraisal instead of the usual inflated valuations employed by real estate charlatans such as Doe. Given the various conflicting proposals sent by Affordable to Argent, it becomes more probable than not that certain agents/servants/employees within Argent's loan operations acted as inside "point men" to perpetuate the scam.

At various times prior to the closing Costa and Doe continued to inform Jenkins that closing costs had risen. Costa and Doe attributed the rampant rise of closing costs stemmed from credit and underwriting issues raised by the lender (Argent). Argent employed Mullen as the settlement agent even though public records revealed Mullen's association with Doe as Doe's attorney, business associate and co-defendant in another civil suit. Immediately prior to the closing Jenkins received a message from Mullen instructing plaintiff to bring an additional $5,000.00 to the closing. At the closing, held on May 30th, 2003, the settlement documents indicated that the purchase price of the property was $140,000.00 with a $5,000.00 "credit" (as opposed to cash). From seller to buyer with no mention of secondary financing from Doe. Mullen and Doe informed Jenkins that Argent had rejected the cash buy-down, and instructed him to sign a "side agreement" indicating that the parties closed the loan on original terms without any buy-down. Mullen has claimed that he had no time to generate new closing documents, but public records indicate that the deed and mortgage were not recorded until June 9th, 2003.

Dinezza requested that Mullen wire his proceeds into a bank account. Doe asked Dinezza, rhetorically one supposes, if he was ready for the "next deal."

At the closing Jenkins and Dinezza signed a RESPA statement indicating that Jenkins total cash contribution at the closing was $23, 556.76, the correct figure; another RESPA statement, signed by Dinezza only and transmitted to Argent, indicated that Jenkins only contributed $16,256.56 to the closing. Jenkins informed Argent of this discrepancy in October of 2003, but

Argent never responded. Of course, someone could have forged Dinezza's name to the phantom RESPA statement; plaintiff would welcome input from Dinezza or his counsel on this matter.

Steven Dinezza telephoned Jenkins on or about November 5, 2003 to discuss irregularities from the closing. Dinezza admitted that he knew that the real purchase price was $140,000.00 and that Jenkins would end up paying Doe's commission, but claims that he had no idea what Doe would do to "pull it off."

Fraud by its nature implies deceit, deception, artifice and trickery. The facts of this case Present a perversion of truth that prejudiced the rights of the plaintiff. No reasonable person can read these facts and not conclude that these defendants engaged in covin and collusion to work a fraud on the plaintiff. How else can one explain how everybody involved in this case ended up on the same page save for the plaintiff?

The defendants formed an association in fact and cooperated at various levels to defraud the plaintiff and share in the monetary rewards. There were multiple acts of mail and wire fraud committed by all defendants, not to mention possible state crimes of bribery, acceptance of gratuities, money laundering and forgery.

At this point the plaintiff requests that this Court take judicial notice of the modern technology of loan closing, which by necessity requires the use of the mails, fax transmissions and electronic documentation. Argent's unsavory reputation as a predatory lender also deserves judicial notice.

## II. DISCUSSION OF AUTHORITIES

## A. PLAINTIFF'S COMPLAINT MEETS THE MINIMUM STATUTORY REQUIREMENTS OF A CIVIL RICO CLAIM

Rule 12(b)(6) must be read in conjunction with Rule 8(a), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." **Wright & Miller, Federal Practice and Procedure, Section 1356**. Rule 8 enumerates a notice pleading standard which creates "a powerful presumption against rejecting a pleading for failure to state a claim." **Gilligan v. Jamco Development Corp.**, 108 F. 3d 246, 249 (9th Cir. 1997). A court must not grant a 12(b)(6) motion "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitled him to relief." **Conley v. Gibson,** 355 U.S. 41, 45-46 (1957); see also **Miranda v. Ponce Federal Bank,** 948 F.2d 41, 44 (1st Cir. 1991).

In ruling on a motion to dismiss for failure to state a claim the court does not weigh possible trial evidence, "but merely determines whether the complaint is legally sufficient." **Fefa v. Local 3 International Brotherhood of Electrical Workers,** 905 F. 2d 35, 37 (2nd Cir. 1990). In assessing the merits of a 12(b)(6) motion the court must accept as true all well-pleaded allegations in the complaint and draw all reasonable inferences in favor of the non-moving party. **McDonald v. Santa Fe Trail Transportation Authority,** 427 U.S. 273 (1976); **Correa-Martinez v. Arrillaga-Belendez,** 903 F.2d 49, 51 (1st Cir. 1990).

Rico targets the negative impact of organized criminality on the society and the economy. The Supreme Court has held:

> Rico is to be construed broadly. This is the lesson not only of Congress' self-consciously expansive language and over-all approach, but also of the express admonition that Rico be literally construed to effectuate its remedial purposes. **Sedima, S.P.R.L. v. Imrex Co.,** 473 U.S. 479, 497-498 (1985).

This "liberal construction" directive is "nowhere more evident than in the provision of a private action for those injured by racketeering activity." **Sedima,** 473 U.S. at 498.

The case of **Miranda v. Ponce Federal Bank,** 948 F.2d 41 (1st Cir. 1991) involved a discharged bank employee alleging multiple instances of sexual harassment as part of a scheme to obstruct a federal investigation. In affirming the dismissal of that plaintiff's *amended* complaint (emphasis added) the First Circuit rejected the theory that each incident of harassment was a separate predicate act. **Miranda,** at 47 n. 6. Just how a case involving multiple incidents of the same act compares to the case at bar escapes this writer.

In **Sharpe v. Kelley,** 835 F. Supp. 33 (D. Mass. 1993), also a sexual harassment case, Justice Skinner denied defendant's motion to dismiss a Rico claim, finding that based on the facts the alleged acts of sexual harassment, in theory, had no closure date, thus making it possible for that plaintiff to prove multiple predicate acts. Justice Skinner went on to state that "Neither the First Circuit nor the Supreme Court has set an absolute minimum duration for criminal activity under Rico." **Miranda,** at page 35. If one can distinguish between the fact patterns of **Miranda** and **Sharpe** then it would follow that **Miranda** does not necessarily represent controlling authority in this matter.

### B. PLAINTIFF HAS ADEQUATELY PLEADED MORE THAN TWO PREDICATE ACTS

Dinezza argues that **Ahmed v. Rosenblatt,** 118 F.3d 886, 889 (1st Cir. 1997) stands for the proposition that Plaintiff's complaint should be dismissed, **inter alia,** for failure to adequately

plead wire and mail fraud. Dinezza ignores the fact that plaintiff also alleges activities one could easily classify as embezzlement, bribery, acceptance of gratuities and money laundering, all predicate acts in and of themselves. The alleged fraud in **Ahmed** was not predicated on communication but instead a general scheme, resulting in dismissal because plaintiff failed to allege the times, places and content of the mailings. **Ahmed** at p. **889. Ahmed** also had a very different fact pattern, since that plaintiff sued his own attorney, two prospective purchasers, a title company and innocent assignees of a secured interest after the title company refused to close the loan with the second purchaser after discovering a recorded lien by a prior purchaser.

Plaintiff has more than adequately alleged that the defendant engaged in mail and wire fraud in violation of **18 U.S.C 1341 & 1343**. Plaintiff has identified a time line, the nature and objectives of the scheme as well as the identities and roles of the participants. Plaintiff need not provide Dinezza with an ultimate laundry list of every single mailing or wiring in order for this defendant to plead a defense. Dinezza would certainly possess far more knowledge than plaintiff of Dinezza's activities with Doe and others. Moreover, the Plaintiff in the case at bar does not rely on the content of all mailings and wirings as fraud, as even innocuous communications qualify as fraud if they are incident to an essential element of the scheme. See **Schmuck v. United States**, 489 U.S. 705 (1989).

### C. PLAINTIFF HAS ADEQUATELY PLEADED THE EXISTENCE OF AN 'ENTERPRISE'

The Rico statute provides for a broad definition of the term "enterprise." Rico defines an "enterprise" as "any union or group of individuals associated in fact though not a legal entity." **18** U.S.C. s1961 (4).

Dinezza asserts at page 4 of his supporting memorandum that "Plaintiff provides no factual support for this allegation that Defendants constituted an ongoing organization 'with members functioning as a continuing unit." Plaintiff obviously has no duty to prove any facts at the 12(b) (6) stage of the proceedings.

There exist no restrictions upon the association-in-fact embraced by the broad definition of "enterprise" found in **s1961(4)** of Rico; such associations may include any group of individuals, see **United States v. Turkette**, 452 U.S. at p. 580 (1981) as well as any group of individuals and corporations, see **United States v. Feldman** at 362-363 (9th Cir. 1985).

Plaintiff clearly articulated an enterprise more than a corporate entity and its agents conducting their regular business. What emerges from Plaintiff's pleadings is an associated-in-fact enterprise distinguishable from the racketeering activity it engages in. Plaintiff does not adhere to the accidental view of history, and it certainly appears that these Defendants operate as a well-oiled machine able to function in ordinary business as well as racketeering. It certainly appears that racketeering may well be the ordinary business of some of these defendants.

As a practical matter, the existence of an association-in-fact enterprise may require extensive discovery as opposed to a summary disposition under Rule 12(b) (6). On that note, the Plaintiff feels confident that extensive discovery could well result in turning this matter as a class action, especially in regard to Doe, Mullen, Gilmore, Affordable and Argent, and even possibly Dinezza. As to Dinezza, the sales history of 107 Hendrick Street, Providence, RI, taken with the fact that Dinezza grossed at least $63, 940.38 from his sale to Jenkins, indicate that Dinezza purchased the property for short money from a distressed seller as part of a "flip scheme."

## D. PLAINTIFF HAS ADEQUATELY PLEADED A "PATTERN OF RACKETEERING ACTIVITY

The Supreme Court has ruled that proving a pattern requires showing that the racketeering acts are "related" and "amount to or pose the threat of continued criminal activity." **H. J. Inc. v. Northwestern Bell Telephone Co.**, 492 U.S. 229, 239 (1989). The Supreme Court defined "related acts" as those "that have the same or similar purposes, results, participants, victims or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated." **H. J.** at 240. "Continuity" requires either a "closed period of repeated conduct" or "past conduct that by its nature projects into the future with a threat of repetition." **H.J** at 241. Of course, what constitutes a threat of continued racketeering activity turns on the specific facts of each case. **H. J.** at 242.

In **Apparel Art International Inc. v. Jacobson**, 967 F.2d 720, 723-724 (1st Cir. 2002) the First Circuit failed to find a pattern where the relevant predicate acts consisted of a bribe in late 1984 or early 1985 and a fraudulent conveyance several years later. The case at more closely resembles the fact pattern of **Corporacion Insular De Seguros v. Reyes Munoz**, 826 F. Supp. 599 (D. Puerto Rico 1993) where corporate insiders defrauded the same insurer multiple times via a fraudulent claim scheme. Each time those defendants defrauded CIS "certain procedures were followed for the reopening of dormant files, the issuance of claim checks, the destruction of records, the transferring of the check to an intermediary, the laundering of the proceeds, and finally the payment of the 'kickback.' **Corporacion Insular De Seguros**, at 603.

If we follow Dinezza's line of reasoning here to its logical extreme, then it would be virtually impossible for any single plaintiff to maintain a civil Rico action, an absurd contention at best.

Plaintiff respectively suggests that discovery will demonstrate that these Defendants have effectuated similar schemes on other victims. While Plaintiff does not seek **carte blanche** in

Conducting discovery, he respectively reminds the Court that it would be unjust to restrict discovery where there exist other victims of a repeated pattern conduct and where information thereto is within the exclusive control of the defendants. Plaintiff seriously disbelieves the notion that the case at bar marks the first time that the combination of Doe, Gilmore, Affordable, Argent and Mullen combined to financially eviscerate someone, and Dinezza's history indicates that he may be no stranger to operating out of the second story.

**E. PLAINTIFF HAS ADEQUATELY PLEADED A RICO CONSPIRACY CLAIM**

For a defendant to be liable under **18 U.S.C. S1962 (d)**:

> A conspirator must intend to further an endeavor which,
> If completed, would satisfy all of the elements of a substantive offense, but it suffices that he accept the goal of furthering and facilitating the endeavor. He may do so in any number of ways short of agreeing to undertake all of the acts necessary for the crimes completion….It makes no difference that the substantive offense under subsection (c) requires two or more predicate acts. The interplay between subsections (c) and (d) does not permit us to excuse from the reach of the conspiracy provision an actor who does not himself commit or agree to commit the two or more predicate acts requisite to the underlying offense.

**Salinas v. United States**, 522 U.S. 52, 65 (1997). In light of **Salinas** Dinezza's arguments that the complaint does not allege facts showing that Dinezza 's conduct. The law does not require that any such facts be pleaded in order to state a claim against a Rico co-conspirator.

Plaintiff's allegations clearly indicate that Dinezza adopted the goal of facilitating a Rico endeavor. As stated previously, these defendants were a well-oiled machine operating from the same page of the same playbook.

**F. PLAINTIFF HAS ADEQUATELY PLEADED COMMON LAW FRAUD AND DECEIPT**

With regards to fraud pleading "the degree of specificity required by Rico mail or wire fraud

Is no more or less than which is required in general fraud and security fraud cases." **Corporacion Insular De Seguros v. Reyes Munoz**, 826 F. Supp. 599, 608 (1993), citing **New England Data Services v. Becher**, 829 F. 2d 286, 290 (1987).

Dinezza can hardly state that it has not been put on notice of the nature and time period of a Patently fraudulent course of conduct. Even if this Court were to conclude that Plaintiff did not formally satisfy the requirements of Rule 9(b), the Court must examine "the general scheme to defraud, the establishment of interstate commerce and the resulting implication of the use of interstate wires and mails, multiple defendants and whether the communications were between defendants solely or between the defendants and plaintiffs, which would affect the final factor of whether the facts were peculiarly within the defendants' control." **Becher**, at page 290.

Given the analysis proscribed by the First Circuit, the Plaintiff should be allowed to engage in discovery and amend his complaint to conform to the new facts thereby discovered. Under the substantive laws of Rhode island "where fraud is alleged, the court has a wide discretion with respect to the admission of evidence either to prove or disprove that allegation." **Berberian v. Martin**, 100 R.I. 227, 228, 214 A. 2d 189, 190 (1965).

**CONCLUSION**

Dinezza has palpably failed to meet the heavy burden of proof required for the granting of a 12(b) (6) motion. This Court should summarily deny Dinezza's motion without further briefs or argument.

Respectfully submitted, by the Plaintiff, **pro se**

Dated: 3/27/06

Paul J. Jenkins
PO Box 315
Providence, RI 02901-0315

Tel, Fax (401) 861-0416

I, Paul J. Jenkins, hereby make oath under the pains and penalties of perjury that the factual averments in this memorandum were made on my personal knowledge, information and belief.

Signed under the pains and penalties of perjury on 3/27/06.

-------------------------------------------------------------
Paul J. Jenkins

Certificate of Service

I hereby certify that I served the within motion by postage prepaid first class mail on March 27, 2006 directed to:

| | | |
|---|---|---|
| James W. Ryan, Esq.<br>Partridge Snow & Hahn<br>180 S. Main Street | Michael J. Pisaturo, PC<br>1312 Atwood Avenue<br>Johnston, RI 02919 | Paul Gilmore<br>53 Oak Tree Dr.<br>Johnston, RI<br>02919-3092 |

Signed under the pains and penalties of perjury on 3/27/06.

-------------------------------------------------------------
Paul J. Jenkins