UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND

FILED
JUN 14 2006
U.S. DISTRICT COURT
DISTRICT OF RHODE ISLAND

CIVIL ACTION NO:
05-513ML.

PAUL J. JENKINS

VS.

MARGARET DAVIS MULLEN
WILLIAM F. MULLEN
JOHN DOE
STEVEN DINEZZA
LEA DINEZZA
PAUL GILMORE
AFFORDABLE FUNDING MORTGAGE CORPORATION
RICHARD COSTA
ARGENT MORTGAGE COMPANY, LLC

**PLAINTIFF'S CONSOLIDATED MEMORANDUM IN OPPOSITION TO MOTIONS TO DISMISS FILED BY AFFORDABLE AND LEAP DINEZZA**

## INTRODUCTION

This consolidated memorandum will serve to rebut the arguments, so-called, advanced By both Affordable Funding Mortgage Corporation ("Affordable") and by Lea Dinezza. However, Lea Dinezza has chosen to simply rehash the arguments already advanced by Steven Dinezza, ignoring the substantial documentary material submitted in connection with Plaintiff's Motion for Reconsideration. Given this lackluster effort by Lea Dinezza, Plaintiff will not waste the Court's time with a duplicative response to this "mailed in" effort.

Affordable's , memorandum, however, unfurls the proverbial horse of a different, yet deeply disturbing color. Other than mimicking the mantras of previous defense memoranda as to RICO, Affordable spews forth a spate of speculative facts and specious theories almost totally devoid of any supporting authorities. Plaintiff cannot determine whether Affordable's memorandum sprang from mindful mendacity or colossal incompetence, or else a combination thereof. In either event, Plaintiff strongly feels that Rule 11 has been compromised and that some form of sanctions, either by this Court or the Disciplinary Board, be imposed.

1. **FACTUAL BACKROUND**

## II. STATEMENT OF FACTS

Defendant "John Doe" is in actuality a real estate broker named Stuart B. Rothman, a principal of "Real Property Solution, Inc." Plaintiff reached a partial and separate settlement with Rothman in April of 2005. At all material times herein Rothman, as a real estate broker, acted as an agent and cohort of Dinezza. {*Note: all page references refer to the voluminous material previously submitted by Plaintiff in connection with his prior Motion for Reconsideration*}

As originally structured, what both Argent and the Court have euphemistically characterized as a "real estate deal gone bad,"[1] specified a purchase price of $148,900.00 with Plaintiff to obtain a mortgage in the amount of $134, 010.00 (pp. 12-21). Rothman initially lured Plaintiff to the property with his standard "take over mortgage regardless of

[1] To state that this was a "real estate deal gone bad" is tantamount to describing hurricane Katrina as a bad rainstorm.

credit" ad in the Providence Journal.[2] Rothman apparently has some relationship with a party named "Eric Ahlberg," who formerly traded as "Take Over Mortgage Corp, America" (p. 9). Standard purchase and sale language indicated that the contract reflected the "final understanding of the parties" and could be altered only by written instrument signed by both parties (p. 21). However, a variety of documents, including the appraisal (p. 28), one of the two conflicting RESPA statements (p. 53), and the curious "side agreement" (p. 58) reference cash payments of anywhere from $5,000.00 to $7,000.00 going from Dinezza to Plaintiff. Since neither Plaintiff nor Dinezza ever agreed in writing to modify the original contract, the side agreement's in effect tries to return to original terms that had never legally been altered. In any event, Plaintiff never received any such funds from Dinezza; there was no "under the table" rebate to the Plaintiff.

The RESPA version given to Plaintiff by Mullen reflects Plaintiff's total earnest money advanced as $16, 256.56 (p. 53); the RESPA given to Plaintiff by Argent pegs Plaintiff's earnest money as $23, 559.76 (p. 54). The plaintiff only signed one RESPA statement, so it remains to be seen what Mullen actually submitted to Argent. The discrepancy between the two figures is approximately $7,000.00, a troubling and problematic recurring sum.

On or about April 28, 2003 Argent mailed plaintiff a "Good Faith Estimate of Closing Costs" which stated the contract sale price as $145,000.00 (p. 44). Both Rothman and Costa[3] derided this document as an "error." By the time Argent generated and mailed its so-called "final" loan documents, the purchase price had further morphed to $140,000.00 (p. 48). However, if we believe the appraisal prepared by Gilmore on March 17, 2003, the

[2] Rothman still runs these ads as of April 30th, 2006 (see p. 7.1)
[3] Costa being an agent of the mortgage broker "Affordable."

purchase price already had been reduced to $140,000.00 (p. 28). The appraiser takes pains to state that a copy of the contract was not made available to him, yet he goes on to describe a $7,000.00 cash buy-down of closing costs going from Dinezza to Plaintiff, which became a central assumption of his appraisal[4] (p. 28). Gilmore seemingly feels that he "answered" Plaintiff's complaint by his letter of January 19, 2006, where he also informed Plaintiff that he met Rothman at the subject premises on March 6, 2003, at which time Rothman paid him his standard fee of $250.00 (p. 40). Plaintiff was not present on March 6, 2003, but he did, on Rothman's instructions, mail Gilmore a money order for $250.00 for his standard fee on March 11, 2003 (p. 41).[5] Obviously, these facts disrupt Gilmore's time line and raise questions as to the acceptance of gratuities. Why Argent ever considered funding this loan at $145,000.00 (p. 44) given this appraisal escapes this writer. When it mailed Plaintiff this appraisal Argent included cover letter language claiming that the document was confidential and not to be disclosed to third parties (p. 25-26); Plaintiff happily disregarded this self-serving language.

For its part, Argent, despite having worked up the numbers for this deal with at least two different purchase prices, cried foul on May 16, 2005, claiming, in effect, having been fraudulently deceived as to the "side agreement" and second mortgage. Argent went on to state that it might well not have funded the loan had it known the true facts (p. 72). Argent and its affiliate Ameriquest had no such strident reaction when plaintiff informed them of the "true facts" on November 7, 2003 (p. 70). One could logically conclude that Argent's lack of a response in 2003 indicated that they were well aware of what had transpired.

---

[4] In the most negative light the appraisal can be construed to compute the property value to be only $133,000.00.

[5] Perhaps Gilmore's standard practice is to be paid twice.

As to which Attorney Mullen actually conducted this closing, it appears that Margaret ("Peggy") Davis Mullen notarized both Argent's loan documents as well as Dinezza's warranty deed (p. 60-61). "Peggy" Davis Mullen is also listed as Argent's email contact for the "Mullen Law Office" (p. 47). It cannot be stated with a straight face that "Peggy" Davis Mullen played no essential role in the closing. However, the said William F. Mullen conducted the "second" closing to secure a second mortgage for Mullen's cohort, client and business partner, Stuart B. Rothman, as evidenced by William F. Mullen's notarizing of the second mortgage deed (p. 66).

In early 2005 Rothman became subject to a "show cause" order issued by the Rhode Island Department of Business Regulation, or "DBR" (p. 1). The DBR lists Rothman's alleged breach of regulations, which forbid such conduct as "substantial misrepresentation," "fraudulent conduct," "acting for more than one party," and receiving "undisclosed commissions and rebates" (p. 2). The DBR was cognizant of the similarity of Plaintiff's situation with another episode of a "take over mortgage scam," the case of **Aurelio v. Rothman DBR No. 03-0073** (p. 2). Cynthia Aurelio Markle also filed suit against Real Property Solutions, Inc, Stuart Rothman and William F. Mullen in a real property action in Rhode Island Superior Court (p. 7).

According to the Better Business Bureau web site, Real Property Solutions, Inc. employs two individuals, John C. Shelton and Attorney William Mullen[6] (p. 8). Although Plaintiff was not yet able to obtain a copy of the recorded instrument from the City of Providence Recorder's Office, there is a document on file revealing William F. Mullen and John C. Shelton as signatory principals of SR Associates, one of Rothman's

---

[6] The BBB web site does not specify whether this Attorney Mullen is the defendant in this suit, the elder William F. Mullen or Attorney William G. Mullen. Stuart Rothman replaced William G. Mullen as the President of Real Property Solutions, Inc subsequent to the events of this matter.

many ventures (p. 10-11). Despite the evident disfavor of the DBR, Rothman still runs his "take over mortgage regardless of credit" ads, the most recent one being in the Providence Sunday Journal of April 30th, 2006 (p.7.1). Stewart Title terminated William F. Mullen as their title agent in the summer of 2003 for undisclosed reasons, although Stewart described the subject attorney as "being slick" and "having done some things." One thing William F. Mullen definitely did was misrepresenting to Stewart in his certification that there was no second mortgage. Plaintiff's closing was so irregular that Stewart readily agreed to reverse the over-priced and unwanted owner's title policy in May of 2005.

One party to this fraud fest who may, up until now in any event, have come out quite well is Dinezza, who grossed proceeds of nearly $64,000.00 according to one of the RESPA statements (p. 53). This windfall made possible, at least in part, by Dinezza's acquisition[7] of the real estate from one Amy Efros Busse for $70,000.00 on May 9, 2002; Ms. Efros Busse had acquired the property from the sick and elderly Margaret Unsworth for $68,500.00 on March 13, 2001 (p. 23.1). Efros Busse and Dinezza both held title for approximately a little over a year, with the former maybe grossing $1,500.00 and the latter grossing almost $64,000.00. Dinezza could either be a talented amateur or "slick," but the words "real estate flip" come to mind.

Of course, these kinds of events should be expected when dealing with a predacious lender such as Argent, who pitches these "hard money" loans to low-end purchasers. The Plaintiff has attached some choice web articles on Argent, an unsavory lender with a

[7] Acquisition maybe the wrong word. Both prior transactions, Dinezza-Efros Busse and Efros-Busse-Dinezza, were well below market. Plaintiff wonders how many RESPA these prior transactions had.

checkered past, replete with class actions, regulatory troubles, lawsuits, forgeries, and corrupt "boiler room" loan shop operations (pp. 74-84).

Argent markets loans via the use of brokers, such as the defendant Affordable Funding. In the case at hand, Affordable worked the scheme on behalf of itself, Rothman and Argent, but it managed not to leave many footprints. Plaintiff can state that the "John McMahon" who allegedly took Plaintiff's "loan application" may be a real person or a fictitious name (p. 62); Plaintiff can state conclusively that the only he ever spoke to from either Argent or Affordable identified himself as Richard Costa, not John McMahon. Curiously, counsel for Affordable has seen fit to attach a copy of the RESPA apparently not submitted to Argent in support of Affordable's Motion to Dismiss, so seems a **prima facie** case of prior and continuing mail fraud by use of bogus documentation has been made. Argent falsely states that Plaintiff sought out Affordable's services, when in point of fact Plaintiff had never heard of Affordable, who apparently works regularly with both Stuart Rothman and Argent (see affidavit of Paul Jenkins under "Tab A").

## III. PERVERSIONS OF FACT AND LAW ADVANCED BY AFFORDABLE

**(a)**

On page 2 of its memorandum Affordable states that "All money Affordable obtained was properly reflected was properly reflected on the Hud-1 in accordance with Real Estate Settlement Procedures Act (RESPA) Regulations and Hud-1 standards." To begin with, since no discovery has occurred, exactly how much money Affordable obtained remains an open question. Given a transaction that featured at least two RESPA statements, side agreements, undisclosed mortgages, conflicting disclosure statements

and at least three purchase prices, how can anyone take at face value unsupported allegations by Afforable's counsel?[8] Unbelievably, Affordable has attached the "other" version of the RESPA to its memorandum, which conflicts with the versions given to both Plaintiff and, apparently, Argent. Perhaps Argent's counsel should have reviewed the docket in this case before submitting a possibly fraudulent document to this Court.

**(b)**

On page 5 of its memorandum Affordable intimates that Plaintiff engineered this debacle by failing to either engage an attorney or seek the advice of counsel for this transaction. While Plaintiff admits that he did not officially hire an attorney for this transaction, counsel for Affordable has absolutely no way of knowing whether Plaintiff sought the advice of counsel at various times during the deal, so counsel should employ more cautious language. In any event, Plaintiff cannot find any authorities in support of the "You should have hired a lawyer" defense.

Civil defense attorneys should zealously represent their clients, but it becomes clear that Affordable's counsel has had an over-dose of his client's "Kool Aid." On page 5 of Affordable's memorandum we read "Furthermore, Plaintiff could have at all material times sought the advice of legal counsel, particularly in light of the fact that Plaintiff is employed as a consultant with Techlaw, Inc., which is an employee-owned Washington DC based company whose mission is to 'analyze complex legal, technical and regulatory matters." First of all, Plaintiff left Techlaw in March of 2004 (see "Tab B"), and in any event never owned a controlling interest in that company's voting stock. Secondly, if counsel had been able to comprehend the entries on Techlaw's web site, including

[8] Affordble's counsel has been notoriously inaccurate as to the facts of this case. Attorney Accardo is also the Registered Agent for Affordable, which could present ethical questions.

Techlaw's "Mission Statement," he would have learned that Techlaw is not a law firm but rather an environmental consulting /document management firm servicing as a consultant to government agencies and Fortune 500 companies (see "Tab C").

©

On page 6 of its memorandum Affordable further indulges in self-satisfied foolishness by asking this Court to dismiss Plaintiff's pendent or supplemental claims should the Court dismiss Plaintiff's RICO claims. Plaintiff is confident of this Court's cognizance of basic procedural knowledge, but he does suggest that Affordable's counsel re-read **28 U.S.C. S1367** along with **United Mine Workers v. Gibbs, 387 U.S. 715 (1866).** Plaintiff assumes that Affordable meant to assert that this Court should decline to exercise pendent jurisdiction under **28 U.S.C. S1367©** and the basic four-pronged analysis laid out in **Gibbs, supra,** if all federal claims are dismissed; if this is the case, then Plaintiff is in agreement with Affordable.

**(d)**

Plaintiff also agrees with Affordable's proclamation as to subject matter jurisdiction as found on page 6 of its memorandum: "...the court would have not {sic} subject matter jurisdiction over affordable because the civil action would not arise under the Constitution, laws, or treaties of the United States ,,,," Plaintiff will do Affordable one better by going out on a limb and stating that this Court never had "subject matter" jurisdiction over Affordable. Plaintiff has labored for years under the impression that courts had "subject matter" jurisdiction over cases rather than people. Plaintiff does not intend to be cruel towards counsel, but even a confused first year law student who finds a Gilbert's outline challenging could write a better brief.

**(e)**

The legal bloopers and bleeps ascend to new heights of hilarity with Affordable's brief discussion of "accord and satisfaction" on page 5. To begin with "accord and satisfaction" is an affirmative defense, which must be included in a responsive pleading , but it is not one of the required defenses under rules 12(g) and 12(h). "Essentially, the subsections of the Rule read together (very carefully) provide that, four of the 12(b)(6) defenses will be waived if not raised in the defendant's first response to the complaint. If the defendant objects to personal jurisdiction, venue, the form of the process, or the method of service of process, she must raise these defenses in the ore-answer motion" **Glannon, Civil Procedure (1997),** p. 287.

**Black's Law Dictionary (7 Ed.)** defines accord and satisfaction as "An agreement to substitute for an existing debt some alternative form of discharging that debt, coupled with actual discharge of the debt by the substituted performance. The new agreement is called the *accord*, and the discharge is called the *satisfaction*." The Rhode Island Supreme Court has defined the doctrine of accord and satisfaction as "{a}n agreement between two parties to give and accept something in satisfaction of a right of action which one has against the other, which when performed is a bar to all actions." **Kottis v. Cerilli, 612 A.2d 661, 664 (R.I. 1992); Cavanaugh v. Bostitch, 92 R.I. 12, 14, 165 A.2d 726, 729 (1960).**

There exists no agreement or meeting of the minds between Plaintiff and Affordable for the compromise of Plaintiff's claims, and Plaintiff has received no consideration from Affordable. See **42 ALR 4th, 12, 18 (1985).** Nothing on record suggest that Plaintiff and Stuart Rothman considered their compromise agreement as a total settlement as to all

parties. Given the disagreement between Plaintiff and Affordable as to the meaning of the partial settlement with Rothman, there exists a genuine material dispute of material facts requiring an evidentiary hearing as opposed to a summary disposition. See **Malave v. Carney Hospital,** **120 F.3d 217, 222 (1st Cir. 1999).**

**CONCLUSIONS**

The Motions to Dismiss filed by Affordable and Lea Dinezza should be denied, and the Plaintiff should be given adequate time to file a first amended complaint as to all defendants

Respectfully submitted,

By the plaintiff, **pro se,**
**Sui generis**

---

Paul J. Jenkins
PO Box 315
Providence, RI 02901-0315
Ph., Fax 401-861-0416

Certificate of Service

I hereby certify that I served the within motion and memorandum by postage prepaid first class mail on June 13, 2006 directed to the following counsel of record who have filed appearances in this matter:

James W. Ryan, Esq.
Partridge Snow & Hahn
180 S. Main Street
Providence, RI 02903

Michael J. Pisaturo, PC
1312 Atwood Avenue
Johnston, RI 02919

Leonard Accardo, Jr., Esq.
Accardo Law Offices
311 Angell Street
Providence, RI 02906

William E. Sanford, III, Esq.
Morrison Mahoney, LLP
121 S. Main Street
Providence, RI 02903

Signed under the pains and penalties of perjury on 6/13/06

---